Joseph **FUCCI**

v.

**GRADUATE HOSPITAL and
John Doe Corporation**

Civil Action No. 95–5799.

United States District Court,
E.D. Pennsylvania.

June 27, 1997.

Rocco C. Cipparone, Jr., Law Offices of Rocco C. Cipparone, Jr., Haddon Heights, NJ, for Joseph Fucci.

Steven R. Williams, Mesirov Gelman Jaffe Cramer & Jamieson, Philadelphia, PA, for Graduate Hosp.

## *MEMORANDUM*

WALDMAN, District Judge.

## I.  *BACKGROUND*

Plaintiff asserts claims under Title VII, 42 U.S.C. § 2000e *et seq.;* the Americans with Disabilities Act ("ADA"), 42 *U.S.C. §* 12101 *et seq.;* the Employee Retirement Income Security Act ("ERISA"), 29 U.S.C. § 1001 *et seq.;* and, the Pennsylvania Human Relations Act ("PHRA"), 43 P.S. § 951 *et seq.* Plaintiff variously alleges that he was terminated by defendant Graduate Hospital because of his "Italian ancestry and/or his male gender", his diabetic condition, his wife's medical condition and his participation in defendant Graduate Hospital's employee medical benefit plan.[1]

Plaintiff also asserts state law claims for wrongful discharge, breach of contract and of a covenant of good faith and fair dealing, as well as, intentional and negligent infliction of emotional distress. The parties are both citizens of Pennsylvania and these claims are premised solely on supplemental jurisdiction.

Presently before the court is defendant's motion for summary judgment.

## II.  *LEGAL STANDARD*

In considering a motion for summary judgment, the court must determine whether the pleadings, depositions, answers to Interrogatories and admissions on file, together with the affidavits, show there is no genuine issue as to any material fact, and whether the moving party is entitled to judgment as a matter of law. Fed.R.Civ.P. 56(c). *Anderson v. Liberty Lobby, Inc.,* 477 U.S. 242, 247, 106 S.Ct. 2505, 2509, 91 L.Ed.2d 202

(1986); *Arnold–Pontiac–GMC, Inc. v. General Motors Corporation,* 786 F.2d 564, 568 (3d Cir.1986). Only facts that may affect the outcome of a case under applicable law are "material." *Anderson,* 477 U.S. at 248, 106 S.Ct. at 2510.

All reasonable inferences from the record must be drawn in favor of the non-movant. *Id.* at 256, 106 S.Ct. at 2514. Although the movant has the initial burden of demonstrating an absence of genuine issues of material fact, the non-movant must then establish the existence of each element on which he bears the burden of proof. *J.F. Feeser, Inc. v. Serv–A–Portion. Inc.,* 909 F.2d 1524, 1531 (3d Cir.1990), *cert. denied,* 499 U.S. 921, 111 S.Ct. 1313, 113 L.Ed.2d 246 (1991) (citing *Celotex Corp. v. Catrett,* 477 U.S. 317, 323, 106 S.Ct. 2548, 2552, 91 L.Ed.2d 265 (1986)). The pertinent facts as uncontroverted or construed in a light most favorable to the plaintiff are as follows.

## III.  *FACTS*

Plaintiff is an Italian–American male. He was employed by Graduate Hospital (the "Hospital") for almost twenty years, from 1974 until his discharge on September 15, 1993. Plaintiff was diagnosed with diabetes in 1986. His wife was diagnosed with multiple sclerosis in 1986. At the time of his termination, plaintiff was a participant in and he and his wife were beneficiaries of the Hospital's employee benefit plan which included medical benefits. At the time of his discharge and since 1992, plaintiff was the Materials Distribution Manager and supervised approximately 32 employees. Frank Longo, Director of Materials Management, selected plaintiff for this position in 1992 and plaintiff's promotion was approved by Theresa Angelone, Vice President of Human Resources. Mr. Longo was plaintiff's immediate supervisor.

---

[1] Plaintiff initially designated as "John Doe Corporation" any other business entity which may have been involved in his termination. Discovery is completed and plaintiff has identified no such entity. It is uncontroverted on the record that plaintiff was employed and terminated by Graduate Hospital. Accordingly, the claims against John Doe Corporation will be dismissed. *See Scheetz v. Morning Call, Inc.,* 130 F.R.D. 34, 37 (E.D.Pa.1990) (fictitious party must be dismissed if not identified during discovery).

Hospital administrators were aware of plaintiff's diabetic condition since at least August 1987 and of his wife's multiple sclerosis since at least November 1991. Indeed, his condition was noted in plaintiff's personnel records since August 18, 1987 and he received treatment at the Hospital for his diabetes as early as 1986. About a month before his termination, plaintiff was on a six or seven week medical leave of absence which Mr. Longo had approved.

On August 19, 1993, Sudie Price, employment manager in the Human Resources Department, told Ms. Angelone that Reginald Johns, a Materials Department inventory clerk directly under plaintiff's supervision, had complained to her that plaintiff was engaged in "loan sharking" with Hospital employees. Mr. Johns told Ms. Price that he and other Hospital employees had borrowed money from plaintiff at high rates of interest and routinely repaid plaintiff by signing over their paychecks to him. Other employees identified by Mr. Johns were Andre Brooks, Ted Wilkins, Roberta Fitzgerald, Kevin Stinney, Andrew Powell, Wesley Corbin, Claude Adams and B.J. Granderson. Mr. Johns further reported that employees who owed plaintiff large sums of money were given overtime hours to expedite repayment. Mr. Johns repeated these allegations in a memorandum to Ms. Angelone dated August 19, 1993.

Mr. Stinney, one of the employees identified by Mr. Johns as having borrowed money from plaintiff, approached Ms. Price on August 19, 1993 to complain about a decrease in his hours. Mr. Stinney also told Ms. Price that plaintiff had loaned money to him, Mr. Powell and several other employees. Plaintiff was responsible for hiring Mr. Stinney. Ms. Price related this information as well to Ms. Angelone.

Ms. Angelone then spoke to Mr. Corbin who told her that plaintiff lends money for a fee and that he had borrowed money from plaintiff for a fee. Mr. Corbin stated that Joseph Hulett, a mailroom clerk, also loaned money to employees but did not state that he had borrowed from Mr. Hulett. Ms. Angelone also interviewed Mr. Longo who said he had not seen any evidence of loan sharking activity but that Marguerite Hall, Supervisor of Central Processing, told him of rumors that plaintiff and Mr. Hulett were engaged in loan sharking.

Ms. Angelone also spoke to Ms. Hall who stated that Greg Horne had told her he borrowed money from plaintiff for a fee. Ms. Hall said she had observed plaintiff dispensing money from a box to employees who signed over their paychecks on several paydays. Ms. Angelone also spoke with Tim Panfile, Assistant Manager of Materials, who told her plaintiff was loaning money to employees for a fee and employees had occasionally given him money to deliver to plaintiff. Mr. Panfile also reported that plaintiff directed him on several occasions to schedule overtime for certain employees who owed plaintiff money. Mr. Panfile told her employees sometimes sign their entire paychecks over to plaintiff.

Ms. Angelone then pulled the cancelled paychecks of all Materials Management Department employees. She found that eight employees on sixteen different occasions endorsed over to plaintiff their paychecks in amounts totaling approximately $10,000. Six of the eight employees were persons identified by Mr. Johns.[2] She found no paychecks of any employee endorsed over to Mr. Hulett.

Ms. Angelone was responsible for all aspects of the employment process "from hiring to termination." Pursuant to defendant's formal employee discipline policy, no one may terminate an employee without contacting the Vice President of Human Resources.

Ms. Angelone concluded that plaintiff should be terminated. She then contacted Timothy Webster, Esquire, an attorney in the Hospital's legal department, to discuss the "legalities" of the situation. Ms. Angelone then reviewed her decision with Samuel Steinberg, the Hospital's President, who ap-

2. The employees who endorsed their paychecks over to plaintiff are Andre Brooks, Gregory Horne, Kevin Stinney, Theodore Wilkins, Calvin Henry, Wesley Corbin, Claude Adams and Andrew Powell.

proved of her decision. She also advised Mr. Longo who concurred with the decision.

On September 15, 1993, Ms. Angelone met with plaintiff in the presence of Mr. Webster and Mr. Longo. Ms. Angelone told plaintiff of the results of the investigation, including her review of the cancelled paychecks. She gave plaintiff the choice of resigning or being terminated. Plaintiff acknowledged that he had loaned money to Mr. Johns and two other unspecified employees, but did not admit to charging a fee.

At the time of his termination, plaintiff told Ms. Angelone that his wife's medical costs were going to increase to approximately $10,000 per month due to a prescription for a newly approved medication which cost $1,000 per month. Plaintiff discussed a month earlier with several Hospital employees, including Marguerite Hall and Karen Staskin, the availability and cost of this new medication but never specifically sought a determination of whether it would be covered under the benefit plan. Plaintiff's wife began taking this new medication in November 1993 and plaintiff was reimbursed by the benefit plan over six months for 90% of the $1,000 cost.[3]

Ms. Angelone avers that she was unaware that plaintiff's wife would be taking such new medication prior to the decision to terminate him and there is no evidence of record to the contrary. A number of hospital employees and their family members have experienced serious medical problems without their being terminated.

Plaintiff was replaced by Tim Panfile, an Italian–American male. Ms. Angelone and Mr. Longo are Italian–Americans.

On June 15, 1994, plaintiff filed a charge of discrimination with the Equal Employment Opportunity Commission ("EEOC"). By checking boxes provided on the EEOC complaint form, plaintiff noted that the bases of discrimination were "national origin" and "other." The "other" notation appears to encompass disability as there is no box specifically so designated on that form. Although a box for "sex" discrimination was provided, it was not marked as a basis for plaintiff's charge.

In the narrative portion of plaintiff's complaint he states that John Derrickson, Vice President of Support Services, told Mr. Longo there were too many "white Italian supervisors" at the Hospital and he would not approve of the hiring of any "new white Italian male supervisors." Plaintiff testified at his deposition that Mr. Longo quoted Mr. Derrickson to him as saying "you got enough white male Italians down there" and that he "didn't want any more white male Italian supervisors hired in material management." Plaintiff states that these comments were made at the time Trudy Mione, an Italian–American female, was hired for a supervisory position in the Materials Management Department. There is no competent evidence of record as to when this occurred.[4]

Mr. Derrickson was not involved in the investigation of plaintiff or the decision to terminate him.[5] There is no evidence that Ms. Angelone was aware of any comment by Mr. Derrickson regarding Italian–Americans at the time she decided plaintiff should be terminated. There is no evidence that Mr. Steinberg was aware of the purported comment by Mr. Derrickson or that Mr. Steinberg harbored any bias or concern regarding the ethnicity of defendant's supervisory staff.

The Notice of Charge of Discrimination sent to the Hospital indicates that the bases of discrimination were national origin and disability. The EEOC's Dismissal and Notice of Rights form indicates that plaintiff's charge of discrimination was dismissed because his attorney requested a Notice of Right to Sue. Plaintiff never filed a complaint

---

**3.** Plaintiff and his wife continued to receive health benefits for six months after his termination. Defendant did not truncate plaintiff's health care plan benefits as it might have pursuant to 29 U.S.C. § 1163(2). *See Burke v. American Stores Employee Ben. Plan,* 818 F.Supp. 1131, 1134–36 (N.D.Ill.1993).

**4.** The only indication of when this occurred is a statement in defendant's brief that it was April 1993. In any event, the court's ultimate resolution is the same whether the alleged statement was made in April 1993 or at an undeterminable time.

**5.** Mr. Derrickson has not worked for the Hospital since January 1994.

with the Pennsylvania Human Rights Commission.

A year and a half after his termination and nine months after filing his EEOC complaint, plaintiff obtained statements from six of the employees who had endorsed paychecks over to him. These statements are preprinted and identically worded, except for the name of each employee which was inserted in a blank space created for that purpose. The essence of the statement is that these employees gave their paychecks to plaintiff to pay him amounts owed for watches, videos and jewelry he gave them to sell on consignment.[6] One of the statements is from Mr. Corbin.[7] None of these statements are under oath.[8]

## IV. DISCUSSION

### A. Exhaustion of Administrative Remedies

Defendant contends that to the extent plaintiff's Title VII claim is premised on gender or national origin plus gender discrimination, defendant is entitled to judgment because plaintiff failed timely to exhaust his administrative remedies.

■■■ A federal court may not adjudicate a Title VII claim unless a timely charge of discrimination has been filed with the EEOC. *See* 42 U.S.C. § 2000e–5(e) (1); *Trevino–*

Barton v. Pittsburgh Nat'l Bank, 919 F.2d 874, 878 (3d Cir.1990); *Brennan v. National Tel. Directory Corp.*, 881 F.Supp. 986, 993 (E.D.Pa.1995). This exhaustion requirement is designed to provide sufficient notice to the defendant concerning the charges and obtain voluntary compliance without resort to litigation. *Neibauer v. Philadelphia College of Pharmacy & Science*, 1992 WL 151321, *2 (E.D.Pa. June 19, 1992). The appropriate scope of a Title VII action is "defined by the scope of the EEOC investigation which can reasonably be expected to grow out of the charge of discrimination." *Ostapowicz v. Johnson Bronze Co.*, 541 F.2d 394, 398–99 (3d Cir.1976), *cert. denied*, 429 U.S. 1041, 97 S.Ct. 741, 50 L.Ed.2d 753 (1977). A Title VII plaintiff may include in a civil complaint claims of discrimination similar or reasonably related to those alleged in the EEOC charge. *See Sandom v. Travelers Mtg. Serv., Inc.*, 752 F.Supp. 1240, 1247 (D.N.J.1990).

As noted, plaintiff marked off "national origin" and "other" as the bases of his discrimination complaint. He did not check off "sex." The Notice of Charge of Discrimination sent to defendant by the EEOC listed national origin and disability, but not sex, as the bases for plaintiff's charge of discrimination. It thus appears that the EEOC did not perceive plaintiff's claim to include gender discrimination and that defendant was not put on notice of such a claim. *See Miller–*

---

**6.** The six identical statements provide as follows:
Date:
I _____, do know Joe Fucci and I worked with him at Graduate Hospital, and I don[sic]t know of any loan sharking for profit by Joe Fucci.
The reason for my check or checks being signed over to Mr. Fucci, [sic] is that Joe would give me watches, videos, jewelry to sell off the job, [sic]on consignment, and I would pay him, [sic]what I owed him and he would give me change from my pay check.
All of the sales and payments were off the clock and done on my personal time and not on Graduate Hospital premises.

**7.** There is no sworn testimony or averment of record from Mr. Corbin denying Ms. Angelone's testimony that just prior to the termination Mr. Corbin told her he had borrowed money for a fee from plaintiff.

**8.** Such unsworn statements are not evidence and may not be considered as such in deciding a motion for summary judgment. *See* Fed.

R.Civ.P. 56(e); *Adickes v. S.H. Kress & Co.*, 398 U.S. 144, 158 n. 17, 90 S.Ct. 1598, 1608 n. 17, 26 L.Ed.2d 142 (1970); *Small v. Lehman*, 98 F.3d 762, 764 n. 5 (3d Cir.1996); *Duffy v. United States*, 1996 WL 472409, *2 (E.D.Pa. Aug.19, 1996); *Asia N. Am. Eastbound Rate Agreement v. Amsia Int'l Corp.*, 884 F.Supp. 5, 6 (D.D.C.1995); *Johnson v. Resources for Human Dev.*, 878 F.Supp. 35, 39 n. 5 (E.D.Pa.1995); *Transcontinental Fertilizer Co. v. Saudi Arabian Fertilizer Mktg. Co. Ltd.*, 1995 WL 27164, *2 (E.D.Pa. Jan.23, 1995); *Inmates, Washington County Jail v. England*, 516 F.Supp. 132, 138 (E.D.Tenn. 1980), *aff'd*, 659 F.2d 1081 (6th Cir.1981).

Nevertheless, because plaintiff testified that although he paid no taxes on the income from such sales, these employees were merely paying him for merchandise they bought or accepted on consignment from him and that he charged no fee to employees to whom he loaned money, the court will assume for purposes of this motion that plaintiff was not loaning money for a profit.

*Turner v. Mellon Bank, N.A.,* 1995 WL 298931, *4, 1995 U.S.Dist. LEXIS 6616, *11–13 (E.D.Pa. May 15, 1995) (summary judgment granted on plaintiff's claims of gender and national origin discrimination for failure to exhaust where EEOC charge mentioned only race discrimination); *Neibauer,* 1992 WL 151321 at *2 (claims of discrimination based on religion and national origin dismissed for failure to exhaust where EEOC charges were based on age and sex discrimination)

■ As noted, plaintiff alleges in his court complaint that he was discriminated against because of his "Italian ancestry and/or his male gender." To the extent plaintiff alleges "or" his gender, the court agrees that he has failed to exhaust his administrative remedies. There is nothing in the EEOC complaint or Notice of Charge which fairly suggests to an employer that plaintiff claims to have been terminated because he is a man. One would not reasonably expect the scope of the EEOC investigation to encompass gender discrimination.

To the extent that plaintiff alleges "and" his gender, however, the court reaches a contrary conclusion. From the recitation in plaintiff's EEOC complaint of an alleged comment regarding the number of "white Italian male supervisors" one could reasonably expect the scope of any ensuing investigation to encompass the possibility of national origin plus gender discrimination.[9] Such form of discrimination is encompassed by and certainly reasonably related to the allegations of discrimination in plaintiff's EEOC charge.

### B. *Plaintiff's Federal Claims*

■ The *McDonnel Douglas/Burdine* analytic framework for Title VII claims applies to plaintiff's ADA and ERISA discrimination claims as well. *See St. Mary's Honor Center v. Hicks,* 509 U.S. 502, 506, 113 S.Ct. 2742, 2746, 125 L.Ed.2d 407 (1993) (Title VII); *Newman v. GHS Osteopathic, Inc., Parkview Hosp.,* 60 F.3d 153, 156–57 (3d Cir.1995) (applying Title VII and ADEA analysis to ADA

pretext case); *Doe v. Kohn Nast & Graf,P.C.,* 862 F.Supp. 1310, 1318 & n. 5 (E.D.Pa.1994) (applying Title VII analysis to ADA claim); *Gavalik v. Continental Can Co.,* 812 F.2d 834, 852 (3d Cir.) (applying Title VII analysis to ERISA claim), *cert. denied,* 484 U.S. 979, 108 S.Ct. 495, 98 L.Ed.2d 492 (1987).

■ Plaintiff has the initial burden of establishing a prima facie case of employment discrimination. *Fuentes v. Perskie,* 32 F.3d 759, 763 (3d Cir.1994). Once plaintiff does so, the burden shifts to the defendant to articulate a legitimate nondiscriminatory reason for the adverse employment decision. *Hicks,* 509 U.S. at 507, 113 S.Ct. at 2747; *Fuentes,* 32 F.3d at 763. The plaintiff may then discredit the employer's articulated reason and show that it was pretextual from which a factfinder may infer that the real reason was discriminatory or otherwise present evidence from which one reasonably could find that unlawful discrimination was more likely than not a determinative cause of the adverse employment action. *Hicks,* 509 U.S. at 511 & n. 4, 113 S.Ct. at 2749 & n. 4; *Fuentes,* 32 F.3d at 763–64. To discredit a legitimate reason proffered by the employer, a plaintiff must present evidence demonstrating such weaknesses, implausibilities, inconsistencies, contradictions or incoherence in that reason that one reasonably could conclude it is incredible and unworthy of belief. *Fuentes,* 32 F.3d at 764–65; *Ezold v. Wolf, Block, Schorr & Solis–Cohen,* 983 F.2d 509, 531 (3d Cir.1992), *cert. denied,* 510 U.S. 826, 114 S.Ct. 88, 126 L.Ed.2d 56 (1993). The ultimate burden of proving that a defendant engaged in intentional discrimination against the plaintiff remains at all times on the plaintiff. *Hicks,* 509 U.S. at 507, 511, 113 S.Ct. at 2747, 2749; *Gavalik,* 812 F.2d at 852.

For purposes of this motion, defendant does not contest that plaintiff can establish a *prima facie* case of employment discrimination under Title VII, the ADA and ERISA. Rather, defendant focuses its argument on a failure by plaintiff to discredit defendant's stated reason for terminating him or other-

---

**9.** A Title VII claim may be premised on alleged discrimination based on a combination of impermissible factors. *See Lam v. University of Ha-* *waii,* 40 F.3d 1551, 1562 (9th Cir.1994); *Arnett v. Aspin,* 846 F.Supp. 1234, 1241 (E.D.Pa.1994).

wise to show that his national origin, gender, diabetes or his right or that of his wife to receive health plan benefits was more likely than not a determinative factor in his termination. Accordingly, the court will similarly focus its analysis.

Plaintiff correctly argues that the seemingly daunting facts that the decision to terminate him was made by an Italian–American and that he was replaced by an Italian–American man do not preclude his Title VII claim. Neither, however, do these facts sustain his claim. To sustain his claim plaintiff relies essentially on three arguments.

▮▮▮ Plaintiff's primary argument is that he was not in fact loaning money to subordinates for a fee. This is not sufficient to show pretext. An employer may terminate an employee fairly or unfairly and for any reason or no reason at all without incurring Title VII liability unless the decision was motivated by invidious discrimination.

It is the employer's belief that plaintiff was engaged in inappropriate loan practices that is important. *See Fuentes,* 32 F.3d at 765 ("To discredit the employer's proffered reason, the plaintiff cannot simply show that the employer's decision was wrong or mistaken, since the factual dispute at issue is whether the discriminatory animus motivated the employer, not whether the employer is 'wise, shrewd, prudent or competent.' "); *Billet v. CIGNA Corp.,* 940 F.2d 812, 825 (3d Cir. 1991) ("what matters is the perception of the decision maker"); *Billups v. Methodist Hosp. of Chicago,* 922 F.2d 1300, 1304 (7th Cir.1991) (inquiry regarding genuineness of employer's nondiscriminatory reason for terminating plaintiff "is limited to whether the employer's belief was honestly held"); *Holder v. City of Raleigh,* 867 F.2d 823, 829 (4th Cir.1989) ("A reason honestly described but poorly founded is not a pretext") (citation and internal quotations omitted); *Hicks v. Arthur,* 878 F.Supp. 737, 739 (E.D.Pa.) (that a decision is ill-informed or ill-considered does not make it pretextual), *aff'd,* 72 F.3d 122 (3d Cir.1995); *Doyle v. Sentry Ins.,* 877 F.Supp. 1002, 1009

n. 5 (E.D.Va.1995) (it is the perception of the decisionmaker that is relevant); *Orisakwe v. Marriott Retirement Communities, Inc.,* 871 F.Supp. 296, 299 (S.D.Tex.1994) (employer who wrongly believes there is legitimate reason to terminate employee does not discriminate when he acts on that belief).

Plaintiff further argues that pretext may be found from the fact that Ms. Angelone did not decide to terminate Mr. Hulett. Plaintiff was a supervisor accused of making inappropriate loans to subordinates. Mr. Hulett was a mailroom clerk. Ms. Angelone had statements from two employees that they had borrowed money for a fee from plaintiff. She had the statement of a third subordinate that other employees gave him money for delivery to plaintiff or endorsed their paychecks over to him, and that the subordinate had been told by plaintiff to schedule overtime for some of these employees. Ms. Angelone saw sixteen paychecks in amounts totaling just short of $10,000 which had been endorsed over to plaintiff by subordinates. She found no paychecks endorsed over to Mr. Hulett. She received no statement from an employee that he had actually borrowed money from Mr. Hulett. One cannot reasonably find on this record that Ms. Angelone's failure to terminate Mr. Hulett shows pretext.

Plaintiff also points to his testimony regarding Mr. Longo's statement about Mr. Derrickson's comment concerning the number of "white Italian male supervisors."[10]

Defendant contends that this evidence is double hearsay and not competent. Plaintiff contends that the statement is admissible pursuant to Fed.R.Evid. 801(d)(2)(A) & (E). It is not. Rule 801(d)(2)(A) applies to a "party's own statement in either an individual or representative capacity." Neither Mr. Derrickson nor Mr. Longo are parties to this action. Rule 801(d)(2)(E) does not apply as one cannot find on the record presented that Mr. Derrickson's alleged statement was made in furtherance of any conspiracy in-

---

**10.** Defendant submits the testimony of Ms. Angelone that Mr. Longo told her such statement was not made. This testimony, however, is hearsay and not competent evidence. There is no affida-

vit or testimony of record from Mr. Longo making such a denial. Moreover, even if there were, the court must accept as true plaintiff's averments about the statement.

cluding him and Mr. Longo to terminate plaintiff.[11]

If the alleged Derrickson statement is admissible against the defendant Hospital, it is by virtue of Rule 801(d)(2)(D). There is, however, no evidence that Mr. Derrickson was expressing his understanding of defendant's hiring or firing criteria or was authorized by defendant to establish such criteria. There is no evidence that defendant acted through Mr. Derrickson in any material way regarding the decision to terminate plaintiff or that Mr. Derrickson was speaking on a matter within the scope of his authority. *See Hill v. Spiegel, Inc.,* 708 F.2d 233, 237 (6th Cir.1983) (absent evidence they were involved in decision to discharge plaintiff or spoke on matter within scope of their authority, discriminatory statements of three managers made to plaintiff's witness not admissible as vicarious admissions by defendant under Rule 801(d)(2)(D)); *Selby v. Pepsico, Inc.,* 784 F.Supp. 750, 757 (N.D.Cal. 1991) (burden on proponent to demonstrate statement of agent concerned matter within scope of authority to secure admission under Rule 301(d)(2)(D)).

█ Even assuming the admissibility of the purported Derrickson comment and accepting as evidence a statement in a brief as to when it was made, it does not show that defendant was motivated by a discriminatory animus in terminating plaintiff. The comment was purportedly made five months prior to plaintiff's termination and before the allegations against plaintiff were even made and investigated. There is no evidence that Ms. Angelone was aware of any such comment by Mr. Derrickson. Ms. Angelone's averment that Mr. Derrickson "had no involvement whatsoever in the investigation or the decision to terminate [plaintiff's] employ-

ment" is uncontroverted. See *Gomez v. Allegheny Health Serv., Inc.,* 71 F.3d 1079, 1085 (3d Cir.1995) (discriminatory statements by non-decisionmaker insufficient to support inference of discrimination by employer), *cert. denied,* —— U.S. ——, 116 S.Ct. 2524, 135 L.Ed.2d 1049 (1996); *Armbruster v. Unisys Corp.,* 32 F.3d 768, 779 (3d Cir.1994) (discriminatory statement by non-decisionmaker "several months" before challenged transfers began insufficient); *Armbruster v. Unisys Corp.,* 914 F.Supp. 1153, 1156–57 (E.D.Pa. 1996) (discriminatory statement must be connected to motive of decisionmaker); *Selby,* 784 F.Supp. at 757 (plaintiff failed to establish connection between discriminatory statement of defendant's Senior Vice President for Human Resources and decision to terminate plaintiff); *Williams v. United Parcel Serv., Inc.,* 1994 WL 517244, *6 (N.D.Ill. Sept.20, 1994) (racially derogatory comment regarding plaintiff by supervisors who investigated allegations against him insufficient to show employer discriminated absent evidence it actually relied on racial stereotypes in making termination decision), *aff'd,* 51 F.3d 276 (7th Cir.1995).

Accepting plaintiff's testimony as true, there is evidence that Mr. Longo was aware of the Derrickson statement. Ms. Angelone avers, however, that she conducted the investigation and made the decision that plaintiff should be terminated. The evidence shows only that Ms. Angelone apprised Mr. Longo of her decision and he concurred. The evidence does not show that Mr. Longo affected or could have reversed Ms. Angelone's decision.

The issue is not whether Ms. Angelone conducted an investigation worthy of the FBI or reached a correct conclusion. From the information she had, Ms. Angelone quite rea-

---

**11.** Defendant argues with considerable force the implausibility of Mr. Derrickson making a comment intended to denigrate or convey bias against Italian–American males to an Italian–American male colleague. Defendant argues that in the context in which the statement was allegedly made, any such statement must logically be taken as an expression of concern about "discrimination in favor of applicants of Italian ancestry." Plaintiff acknowledges that a disappointed black male applicant for a supervisory position which was given to an Italian–American

male complained about an Italian old-boy network in the Materials Department. The court, however, may not weigh the evidence and cannot conclude that the only reasonable interpretation of any such statement is one that is ethnically benign. Moreover, except for remediation, an employer may not justify discrimination against an Italian–American solely by a desire to ensure greater diversity. *See Taxman v. Board of Ed. of Twp. of Piscataway,* 91 F.3d 1547, 1560–64 (3d Cir.1996) (en banc).

sonably could have concluded that plaintiff had engaged in inappropriate loan transactions with subordinates. Plaintiff has not demonstrated the type of weaknesses, implausibilities, inconsistencies or other deficiencies necessary to show that she did not really reach or act upon that conclusion.

■ A verdict may not be based upon surmise, supposition or speculation. One cannot reasonably conclude from the competent evidence of record that the stated reason for plaintiff's discharge was pretextual or that plaintiff's Italian ancestry alone or in combination with his gender was a motivating or determinative factor in the decision to terminate him. Accordingly, summary judgment will be granted on plaintiff's Title VII claim.

Plaintiff argues that a verdict in his favor on the ADA and ERISA claims could be sustained from evidence that he was terminated about a month after returning from a medical leave of absence and after notifying Hospital employees that his wife was a candidate for new medication costing $1,000 per month.

Defendant's plan had been paying approximately $9,000 in monthly benefits for plaintiff's wife's treatment and thus, with the 10% copayment, the new medication would result only in a 10% increase. More importantly, there is no evidence that anyone with whom plaintiff discussed the availability of new medication for his wife ever related those discussions to Ms. Angelone before the termination decision was made. Indeed, the uncontroverted evidence is to the contrary. At the time plaintiff told Ms. Angelone about the new treatment, she had already decided to terminate plaintiff and had so advised him.

■ Timing alone is not sufficient to prove a discriminatory motive. *See Delli Santi v. CNA Ins. Companies*, 88 F.3d 192, 199 n. 10 (3d Cir.1996). When, at the behest of Mr. Longo and with the approval of Ms. Angelone, defendant promoted plaintiff barely a year before his termination, his condition and his wife's were known. *See Proud v. Stone*, 945 F.2d 796, 797 (4th Cir.1991) (that same individual terminates employment within relatively short time span after hiring

creates "strong inference" that "discrimination was not a determining factor for the adverse action taken by the employer"); *Caussade v. Brown*, 924 F.Supp. 693, 703 (D.Md.1996) (same after recommending a promotion), *aff'd*, 107 F.3d 865 (4th Cir.1997).

One simply cannot find from the competent evidence of record that the stated reason for plaintiff's termination was unworthy of belief or that plaintiff was more likely than not terminated because of his diabetes or his or his wife's eligibility for benefits under defendant's employee health plan. Accordingly, summary judgment will be granted on plaintiff's ADA and ERISA claims.

### C. *Plaintiff's State Claims*

Defendant notes with some force various deficiencies in at least some of plaintiff's supplemental claims.

It appears that plaintiff's failure to file an administrative complaint with the Pennsylvania Human Rights Commission ("PHRC") within 180 days of the last alleged discriminatory act would preclude a PHRA claim. *See* 43 P.S. § 959; *Flagg v. Control Data*, 806 F.Supp. 1218, 1221 (E.D.Pa.1992), *aff'd*, 998 F.2d 1002 (1993), *cert. denied*, 510 U.S. 1052, 114 S.Ct. 710, 126 L.Ed.2d 676 (1994); *Price v. Philadelphia Elec. Co.*, 790 F.Supp. 97, 98 (E.D.Pa.1992); *Clay v. Advanced Computer Applications*, 522 Pa. 86, 559 A.2d 917, 919–20 (1989).

It appears that plaintiff's wrongful discharge claim may be preempted by PHRA and ERISA. *See Clay v. Advanced Computer Applications*, 522 Pa. 86, 559 A.2d 917, 918 (1989) (PHRA); *Ingersoll–Rand Co. v. McClendon*, 498 U.S. 133, 140, 111 S.Ct. 478, 483, 112 L.Ed.2d 474 (1990) (ERISA).

Defendant correctly notes that plaintiff's burden to rebut the at-will employment presumption necessary to sustain his breach of contract claim is considerable. Defendant's progressive discipline policy purports to codify disciplinary practices and procedures "for all employees." On the other hand, "employee" is defined at the end of the policy statement to exclude management or supervisory personnel. Thus, a strong argument can be made that a reasonable person in plaintiff's position would not interpret this policy as

applying to him. Further, the policy states that "serious misconduct" may result in immediate termination. Defendant reasonably might have, but not necessarily, concluded that plaintiff engaged in "serious" misconduct.

Defendant contends that Pennsylvania law does not recognize a claim for breach of a duty of good faith and fair dealing arising from the termination of an at-will employment relationship. *See Green v. Bryant,* 887 F.Supp. 798 (E.D.Pa.1995); *Whelan v. CareerCom Corp.,* 711 F.Supp. 198 (M.D.Pa. 1989); *Engstrom v. John Nuveen & Co.,* 668 F.Supp. 953 (E.D.Pa.1987). Courts, however, have concluded that at-will employment contracts contain an implied covenant of good faith and fair dealing under Pennsylvania law. *See EEOC v. Chestnut Hill Hosp.,* 874 F.Supp. 92, 96 (E.D.Pa.1995); *Somers v. Somers,* 418 Pa.Super. 131, 613 A.2d 1211, 1213 (1992). The claims in those cases, however, did not arise from a termination of the at-will employee. The Court in Green concluded that the general principle articulated in *Chestnut Hill* and *Somers* does not apply in termination cases because "there is no bad faith when an employer discharges an at-will employee for good reason, bad reason, or no reason at all, as long as no statute or public policy is implicated." *Green,* 887 F.Supp. at 803. Plaintiff, however, has asserted statutory and public policy violations. On the other hand, the public policy exception applies only where there is no available statutory means of vindicating the policy in question. *See Wolk v. Saks Fifth Ave., Inc.,* 728 F.2d 221, 222 (3d Cir.1984) (wrongful discharge and breach of contract claims); *Bruffett v. Warner Comm., Inc.,* 692 F.2d 910, 912, 920 (3d Cir.1982) (breach of contract and breach of covenant of good faith and fair dealing claims); *Kinnally,* 748 F.Supp. at 1146 (wrongful discharge claim). It does appear that statutory remedies are provided to vindicate the type of violations alleged by plaintiff.

Plaintiff's claim for intentional infliction of emotional distress may be barred by the exclusivity provision of the Pennsylvania Workmen's Compensation Act, 77 P.S. § 1 *et seq.* ("WCA"). See 77 P.S. § 481(a); *Poyser v. Newman & Co., Inc.,* 514 Pa. 32, 522 A.2d 548, 551 (1987) (no intentional tort exception to the exclusivity clause of the WCA); *Dugan v. Bell Tel. of Penn.,* 876 F.Supp. 713, 723–24 (W.D.Pa.1994); *Doe v. William Shapiro, Esq., P.C.,* 852 F.Supp. 1246, 1254 (E.D.Pa.1994); *Gilmore v. Manpower, Inc.,* 789 F.Supp. 197, 198–99 (W.D.Pa.1992); *McMahon v. Impact Systems, Inc.,* 1992 WL 95920, *2 (E.D.Pa. April 15, 1992); *Sibley v. Faulkner Pontiac–GMC, Inc.,* 1990 WL 116226, *7 (E.D.Pa. Aug.7, 1990). Defendant also correctly notes that conduct in the employment context will rarely rise to the level of outrageousness necessary to support an intentional infliction of emotional distress claim. *See Cox v. Keystone Carbon Co.,* 861 F.2d 390, 395 (3d Cir.1988), *cert. denied,* 498 U.S. 811, 111 S.Ct. 47, 112 L.Ed.2d 23 (1990); *Stouch v. Brothers of Order,* 836 F.Supp. 1134, 1145–46 (E.D.Pa.1993).

Plaintiff's claim for negligent infliction of emotional distress may be barred by the WCA. *See Dugan,* 876 F.Supp. at 723–24. Also, it does not appear that plaintiff, who clearly did not witness an accident injuring a close relative, suffered distress as a result of a breach by defendant of a distinct pre-existing duty of care or sustained any physical injury. *See Green,* 887 F.Supp. at 801–02; *Armstrong v. Paoli Mem'l Hosp.,* 430 Pa.Super. 36, 633 A.2d 605, 609 (Pa.Super.1993), *appeal denied,* 538 Pa. 663, 649 A.2d 666 (Pa.1994).

■ Where all federal claims are disposed of before trial, however, any supplemental state law claims are ordinarily dismissed. *See Borough of W. Mifflin v. Lancaster,* 45 F.3d 780, 788 (3d Cir.1995); *Lovell Mfg. v. Export–Import Bank of the U.S.,* 843 F.2d 725, 734 (3d Cir.1988); *Downey v. United Food & Commercial Workers Union,* 946 F.Supp. 1141, 1159 (D.N.J. 1996); *Litz v. City of Allentown,* 896 F.Supp. 1401, 1414 (E.D.Pa.1995); *Cooper v. City of Chester,* 810 F.Supp. 618, 625 (E.D.Pa.1992); *Heller v. CACL Fed. Credit Union,* 775 F.Supp. 839, 843 (E.D.Pa.1991). The merits of at least some of plaintiff's state claims are arguable and their resolution may require a more intricate analysis and application of state law involving the

dedication of further court resources. Accordingly, the court will dismiss plaintiff's state law claims without prejudice to reassert those claims which, upon reflection, he may deem it appropriate to pursue in the state courts. See 28 U.S.C. § 1367(d).

## V. CONCLUSION

Plaintiff has not presented evidence from which one reasonably could find incredible and unworthy of belief defendant's stated reason for his termination that after conducting an investigation into allegations plaintiff loaned money to subordinates for a fee, Ms. Angelone concluded, however, correctly or incorrectly, that the charge was true. Plaintiff has not otherwise presented competent evidence sufficient to sustain a finding that his Italian ancestry, his ancestry plus gender, his diabetes, or his or his wife's eligibility for employee health benefit plan payments played an actual and determinative role in his termination.

Accordingly, judgment will be entered for defendant on plaintiff's federal claims. The John Doe claims will be dismissed, and plaintiff's supplemental state law claims will be dismissed without prejudice. An appropriate order will be entered.

## ORDER

AND NOW, this 27th day of June, 1997, upon consideration of defendant's Motion for Summary Judgment and plaintiff's response thereto, consistent with the accompanying memorandum, IT IS HEREBY ORDERED that said Motion is GRANTED and JUDGMENT is ENTERED in the above action for defendant and against plaintiff on his federal claims, plaintiff's state law claims against defendant are DISMISSED without prejudice pursuant to 28 U.S.C. § 1367(c)(3) and all of plaintiff's claims against defendant "John Doe Corporation" are DISMISSED; and, accordingly the above action is closed.